*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CHRISTOPHER LEE WILLIAMSON,

       Plaintiff-Appellant,

v

ANDREW DEAN ADAMS,

       Defendant-Appellee.

UNPUBLISHED
April 18, 2024

No. 366453
Montcalm Circuit Court
LC No. 2022-029106-NI

Before: BOONSTRA, P.J., and FEENEY and YOUNG, JJ.

PER CURIAM.

The trial court granted defendant's motion for summary disposition under MCR 2.116(C)(10), concluding that there was no genuine issue of material fact that the injuries plaintiff suffered in an automobile accident between these two drivers do not rise to the no-fault threshold of a serious impairment of body function. For the reasons discussed below, we conclude that the trial court did not err in granting summary disposition and we affirm.

Although plaintiff spends a fair amount of time arguing that the June 21, 2019, accident was defendant's fault, that is not an issue presented here. In his brief, plaintiff describes the accident as happening when defendant, after stopping at a stop sign, pulled out in front of plaintiff and plaintiff was unable to stop in time to avoid colliding with defendant.

At the time of his January 4, 2023, deposition, plaintiff testified that he was working at a restaurant in Dorr. He further testified that, in terms of injuries, his biggest complaints are anxiety and his knees, which limit him from doing landscaping work, plowing, and irrigation. Additionally, he has anxiety while driving. He stated that he sought medical care for his anxiety, but they wanted to put him on medication which he declined because he feared relapse due to his drug addiction. He does not attend counseling for the anxiety.

At his deposition, plaintiff was unsure about which leg was injured in the accident:

Q     All right. The next claimed damage: Subpart b in paragraph 10 of your complaint it says, "A sprain, contusion and/or injury to his left knee." Okay? So how did your left knee get injured in the accident?

A    Smashed up against—I'm assuming, I didn't see it.  I don't have cameras in my car, but my leg, the whole thing was liked swelled and couldn't move.  It was like really, really, really fat.  I think—

Q    Your left leg?

A    Yes, my—I think it was my left leg.  I don't want to say for sure but it was one—I can't remember the exact leg.  I think it was the left, though.

Plaintiff then went on to describe that his left knee hit the dash.  He reported that nothing was broken, just sprained.  Plaintiff stated that he was able to get out of his vehicle at the scene on his own.  He was treated and released at the hospital after the accident, being driven there by a Good Samaritan at the scene.  He was given a knee brace for the injury.  Plaintiff reports that his knee pain has gotten worse since the accident.

Plaintiff also testified that he has some pain in his right knee, although not as much as in his left knee.  But he denied having any bruising, contusions, or sprain of the right knee as a result of the accident.  He also reports an injury to his left chest wall that makes it harder to run and play golf.  He sought care for the chest injury at White Pine Family Medicine in Cedar Springs.  They referred him to physical therapy, which he says refused to accept him because he "couldn't lift— couldn't push with [his] left arm at all."

When asked about his claim of a sprain to his left wrist and a contusion to his left hand, he stated that he could not remember if he had sustained those injuries.  He did state that a finger and the thumb on his left hand "locks up every so often."  He was offered a cortisone shot for the hand, but declined because he did not want to take anything with needles.  When asked about his claim of the accident aggravating a pre-existing injury, he denied having any medical problems before the accident.

As for medical restrictions, plaintiff states that he had "light limitations" until fully healed.  On cross-examination by his counsel, plaintiff testified that his knee locks up and he ascribed to an exacerbation of his Osgood Schlatter's syndrome.  Defense counsel on redirect inquired about the Osgood Schlatter's disease, and plaintiff said he had been treated for the disease.  He stated that he had surgery for it about 10 years before the accident, but the surgery only made it worse.

To establish that he meets the no-fault threshold for a serious impairment of body function, plaintiff presented in his trial court reply brief the original medical report from the emergency department visit after the accident and a subsequent Independent Medication Examination (IME) report.[1]

Plaintiff was seen in the emergency department of Spectrum Health Kelsey Hospital in Lakeview by Dr. Justin R. Dueweke.  Dr. Dueweke's report reflected sprains of the left knee and left wrist, and contusions of the left knee, left hand, and left chest wall.  Plaintiff was treated at this hospital without admission and discharged to home care.  Plaintiff was administered two

---

[1] The IME is dated March 9, 2023, almost four years after the accident occurred.

tablets of 5-325 mg Norco. The Review of Systems was negative for everything except headache and joint and muscle pain. It also reflects a past medical history of anxiety, bipolar 1 disorder, chronic pain of left knee, depression, emphysema, heart palpitations, opioid use disorder (severe, dependence), post-traumatic stress disorder, and tobacco abuse. It also reflected plaintiff's past surgery on his left knee for Osgood-Schlatter's syndrome. The report reflects full strength in all extremities but notes some spot tenderness and plaintiff appearing anxious. Imaging was ordered, but results were pending. The addendum report on the imaging reflected with respect to the left knee that there was "[n]o acute fracture or malalignment. There is fragmentation of the tibial tuberosity with overlying soft tissue swelling, which can be seen with Osgood-Schlatter disease." As for the left tibia and fibula, it reports that "[t]here is no bone or joint abnormality." A left knee brace was applied, plaintiff was given crutch training, and his left wrist was splinted. It appears that plaintiff spent approximately two and one-half hours in the emergency department immediately after the accident.

Turning to the IME, plaintiff was seen by Dr. Yousif Hamati on March 9, 2023. Dr. Hamati provided a two-page report dated March 13, 2023. The report largely recounts what plaintiff told Dr. Hamati as well as Dr. Hamati's review of the accident report itself, and the emergency department report. On page 2 of the report, Dr. Hamati summarized his examination as follows:

> On examination, this is a very pleasant 40-ycar-old male, very cooperative. He has answered all questions without any limitation. He is thought to be really honest about his disposition and his life. He weight is around 190 pounds, 5-foot 8-lnches. He walks with a normal gait. He can walk on his toes and heels without any major problem. Neurological examination of both upper and lower extremities, including motor, power, sensation and reflexes were within normal limits. He is a little bit anxious, although again for the history of this patient, he came across very nice and very polite and kind of frustrated with life and frustrated with the anxiety that he has developed since the car accident. Local examination of both legs showed a small old scar for what seems to be removal of a bony protuberance, due to Osgood-Schlatter's disease. This happened before the accident. Since the accident, he has been very tender there with pain shooting down the leg almost to the ankle. He has slight weakness of his quadriceps mechanism due to the injury of his left knee. The right knee seems to have full range of motion and good strength without any complicating factor. He seems to be very sensitive to touching his leg. There is no major Instability in the left knee or the right knee including varus or valgus stress, anterior drawer test, Lachman test, pivot shift test.

> Currently, he does not take any pain medication other than the Suboxone for his history of drug abuse.

> X-rays of the left knee report was reviewed. There was no fracture or malalignment. He had fragmentation of the tibial tuberosity with overlying soft tissue swelling which is usually seen by Osgood-Schlatter disease. The tibia and fibular x-rays were within normal limits. The impression was no acute osseous abnormality of the left knee or the left tibia and fibula.

Dr. Hamati then concluded as follows:

Due to the motor vehicle collision injury, this patient has sustained left knee injury with aggravation of an old Osgood-Schlatter disease, which he has already had one surgery for. He had a wrist sprain, chest contusion as well as increased anxiety and fear of driving. Since his injury, he has been to the emergency room on November 3, 2019 for [a] branch which hit his face. He was also seen on August 16, 2020 for abdominal pain and September 2, 2020 for a bee sting. His last most recent visit to the emergency room was due to Fentanyl abuse because he was going to commit suicide because of his anxiety and his inability [sic] to function due to stresses he has encountered.

The accident has had major affect on this patient, affecting both knees, left much worse than the right. It has aggravated his sensitivity to pain. At this state, no further surgical treatment is needed. Restrictions are a sit/stand option with any kind of work he does. The only thing I worry about in the long run, is continuation of pain across his leg and his admitted post-traumatic stress syndrome as well as anxiety and his fear of driving and being in an accident.

Following briefing and oral argument, the trial court granted defendant's motion for summary disposition at a May 9, 2023, hearing. The trial court opined as follows:

All right. So I appreciate the briefings and the argument. I read this with some interest because many of the questions I've asked Mr. Bosch [plaintiff's counsel] are things that kind of bounce around, and in my mind, as I look at a motion of this nature and then a case with these sort of facts, as much as I would like to be able to see it as the Plaintiff does, I just can't. I'm going to grant the motion for summary disposition. Now, while I do that, I think it's important the Court place on the record; it's a motion brought under (C)(10), and the Court has to view this in the light most favorable to the nonmoving party. In this case, that would be the Plaintiff.

But I keep coming back to this idea of what I read about in the transcript here, whether that is as defined as a threshold to injury as serious impairment of body function. And I go back and I look at the statute, and it defines under Subsection (b), serious impairment of a body function is an impairment of an important body function which is a body function of great values, significance, or consequence to the injured person, and (c) goes on to tell us that it affects the injured person's general ability to lead his or her normal life, meaning it hasn't—it has had an influence on some of the person's capacity to live in his or her normal manner of living.

Now, as I mentioned, I did look at the *Farm Bureau* case because I was trying to match up—and every case is fact-specific, but some of those facts— because if I could summarize the deposition as a whole, and we've referenced several times, the bulk of that deposition dealt with what I would characterize as pre-accident issues, talking about the issues that the Plaintiff was dealing with prior to this accident, and there was really not a whole lot about post-accident issues, and chief in that was this idea that he had this PTSD, anxiety issue. I couldn't ferret out

-4-

from that at all—in fact, maybe to the contrary—how the accident would be responsible at all for the—the PTSD, the anxiety issues.

I'm also just not comfortable with the idea that that, by itself, can sustain a threshold injury, if you will, a serious impairment of a body function. I would also characterize that, as a summary of that deposition testimony, that he prefers not to drive. He prefers not to do certain things, not that he cannot do them, in other words, not that it truly has effected [sic—affected?] his general ability to lead his or her normal life. He's just making these decisions not to do so.

I'm also—I didn't think of it at the time, but I think Defense Counsel has a good point; when we're talking about the doctor involved with this, I do, then, wonder—and I don't think it's clear—that he does have the ability to diagnose sort of this mental health anxiety issue as opposed to, for instance, any issue.

Going to the other ailments that were part of the complaint, chiefly this leg injury, a contusion of the chest, there was very little information—not information—discussion about that today or briefing here.

Again, I'm uncomfortable with the idea that this record would support any sort of conclusion that these issues are the result of the traffic accident. Certainly—now Mr. Bosch, I say this all the time, and I think a lot of times you've heard me say it when you're on the other side. You're welcome to appeal me at any time. It's not going to hurt my feelings at all. The Court of Appeals has said I'm an idiot before. They'll probably say that again in the future, but I'm not comfortable with the idea that what I've seen here today would suggest that these injuries can be attributed to that accident. I recognize if they are exasperating [sic—aggravating?] a pre-existing condition, that might be able to get you there, and that certainly can meet that threshold injury requirement, the general ability to lead his or her life in a normal manner, but the rest of the record doesn't reflect that. It sounds like—not sounds like. I read from the transcript that he just chose not to go to work. He didn't have anything other than—and I'll go back and characterize it—light limitation. But he chose not to go back to work, and I don't know what all the reasons that go into that, but there was nothing that would suggest, then, if I go back to the statute, that it's affecting his general ability to lead his or her normal life.

And then as Defendant has pointed out, sometime in 2020—now nobody put the dates on here, but the accident's [sic] June 21 of 2019, and then in August of 2020, he visits the emergency room department where he has this pelvis pain, ends up with a hernia because of strenuous work. That, by definition, would suggest that he is leading his general, normal life, a laborer doing landscaping and has, in fact, incurred a new and different unconnected injury to the accident in question here, the June 2, 2019, incident. That is completely, as I mentioned, severed from the—the original incident. That fact that he was able to work in a manner to suffer a hernia, back to strenuous work, again, I think looking at this in the light more favorable to the nonmoving party, would suggest that it doesn't meet the serious impairment of a body function.

For all those reasons that I've stated on the record, I'd also adopt by reference, then, the briefings and the arguments of Defense Counsel here, I'm granting that motion for summary disposition. [Hearing Tr, pp 17-21.]

Plaintiff now appeals and for the reasons discussed below, we affirm the trial court's grant of summary disposition.

We review the trial court's decision on summary disposition de novo. *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018). Summary disposition under MCR 2.116(C)(10) is appropriate if there is no genuine issue as to any material fact. *Id.* It is reviewed considering the pleadings, admissions, and other evidence, which is viewed in the light most favorable to the nonmoving party. *Id.*

In resolving this case, we find the greatest guidance in two cases cited by the parties: the Supreme Court's decision in *McCormick v Carrier*, 487 Mich 180; 795 NW2d 517 (2020), and *Patrick, supra*. Turning first to *McCormick*, it lays out a roadmap to determining if summary disposition on a claim of a serious impairment of body function is appropriate.

First, it must be determined whether there is factual dispute regarding the nature and extent of the plaintiff's injuries that is relevant to determining if the threshold is met. *McCormick*, 487 Mich at 194. In this case, there appears to be no dispute over the extent of plaintiff's injuries sustained in the accident. These are detailed in the report of the emergency department physician, Dr. Dueweke, and the parties do not contest these findings. Accordingly, under *McCormick*, it is appropriate to determine whether those injuries reach the threshold for a serious impairment of body function.

As *McCormick*, 487 Mich at 194-195, explains, the no-fault statute establishes a three-prong test for determining a serious impairment:

In those cases where the court may decide whether the serious impairment threshold is met as a matter of law, the next issue is the proper interpretation of MCL 500.3135(7). It provides that, for purposes of the section, a "serious impairment of body function" is "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." On its face, the statutory language provides three prongs that are necessary to establish a "serious impairment of body function": (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life. [Footnote omitted.]

In looking to the first prong, *McCormick* referred favorably to the Court's earlier decisions in *Cassidy v McGovern*, 415 Mich 483; 330 NW2d 22 (1982), and *DiFranco v Pickard*, 427 Mich 32; 398 NW2d 896 (1986), while rejecting its more recent decision in *Kreiner v Fischer*, 471 Mich 109; 683 NW2d 611 (2004), to the extent that *Kreiner* differed from *Cassidy* and *DiFranco*. *McCormick*, 487 Mich at 196. In particular, the *McCormick* Court stated that in considering "impairment," "the focus 'is not on the injuries themselves, but how the injuries affected a particular body function.' " *Id.* at 197, quoting *DiFranco*, 427 Mich at 67.

-6-

Plaintiff points to Dr. Hamati's IME as evidence of an objectively manifested impairment. But the report provides little support for plaintiff's position. First, plaintiff points to a statement in the report that plaintiff's legs are tender to the touch. But the report does not reflect that this was an observation by Dr. Hamati rather than plaintiff's complaint to Dr. Hamati. And, for that matter, the report states that plaintiff is able to ambulate and walks with a normal gait. The report goes on to observe that plaintiff is able to walk on heels and toes "without any major problem." Dr. Hamati further notes that the neurological exam of plaintiff's extremities "were within normal limits." The report describes a bony protuberance, but ascribes it to the pre-existing Osgood-Schlatter's disease. And "no major instability" in plaintiff's knees is noted. Dr. Hamati also reviewed x-rays that did not reflect any physical problems. The closest the report comes to noting a physical impairment is a "slight weakness of his quadriceps mechanism due to the injury of his left knee." Dr. Hamati concluded that there was no need for surgical treatment and the only restriction on plaintiff was a "sit/stand option with any kind of work he does."

Plaintiff also points to portions of Dr. Hamati's report that discussed the accident's effect on plaintiff's mental health. There are two reasons why this reliance is misplaced. First, these are not the doctor's observations but are instead plaintiff's reports. Indeed, at one point in the report it refers to plaintiffs "admitted post-traumatic stress syndrome as well as anxiety and his fear of driving and being in an accident." That is to say, the report relays plaintiff's claims, not objective observations.[2] Second, Dr. Hamati is an orthopedic surgeon, not a psychiatrist. Any discussion of plaintiff's mental health condition is simply outside the doctor's scope of practice. While any events that Dr. Hamati may have observed during the examination might be relevant, he is unable to render an expert opinion on the topic.

Guidance can also be found in the discussion in *Patrick* regarding the plaintiff's claim of hearing loss. In that case, the facts presented both subjective complaints by the plaintiff, Lindsey Patrick, as well as objective observations:

> Review of the record evidence submitted in this matter reveals that Lindsey complained of problems related to hearing loss and ringing in her ears immediately following the car accident and that Dr. Heidenreich determined that Lindsey had mild high frequency sensorineural hearing loss in both ears and an acoustic reflex abnormality. Lindsey's hearing loss was documented in the results of audiological evaluations by Keenan and Dr. Heidenreich. Defendants argue, and the trial court seemingly agreed, that because there exists a subjective component to the hearing tests, namely that Lindsey had to indicate when she heard a particular sound, Dr. Heidenreich's conclusions were not evidence of an objectively manifested

---

[2] As defendant states in his brief, a subjective claim does not become an objective observation merely because the physician repeats it in his report. Plaintiff does argue in his brief that "[t]hrough Plaintiff's subjective reports, Dr. Hamati's Independent Medical Evaluation confirms Plaintiff's subjective complaints through objective observation . . . ." [Emphasis in original.] But it is unclear what "objective observation" plaintiff is referring to. Plaintiff tries to draw an analogy to this Court's decision in *Patrick*. But while *Patrick* did include the plaintiff's subjective reports, it also included observations by third parties, including medical witnesses.

impairment. Rather, defendants contend, the testing that revealed hearing loss was dependent on the subjective verifications of Lindsey and for that reason, her hearing loss does not constitute an objectively manifested impairment. However, the fact that there was a subjective component to the hearing tests does not negate a finding that Lindsey's hearing loss is an objectively manifested impairment. Furthermore, the record also reveals that in addition to Keenan's and Dr. Heidenreich's findings, Lindsey's husband, Christian, testified that Lindsey had difficulties after the accident with speaking too softly or too loudly, which made it hard for him to understand her. Christian observed Lindsey experiencing frustration over her own lack of awareness about the volume of her voice. Christian also testified that Lindsey sometimes did not hear questions that were asked of her and that Lindsey sometimes responded to questions in a way that showed that she did not accurately hear the question. On the basis of his observations of his wife's actions, Christian testified that Lindsey had difficulty hearing adequately in everyday situations. The evidence of Lindsey's medical evaluations and Christian's testimony supports finding that a question of fact exists as to whether Lindsey's hearing was impaired. This impairment to her hearing was observable by others, which would satisfy the standard for showing an "objectively manifested impairment." *McCormick*, 487 Mich at 196-198. "In other words, an 'objectively manifested' impairment is commonly understood as one observable or perceivable from actual symptoms or conditions." *Id*. at 196.

Keenan, Dr. Heidenreich, and Christian testified as to *their* observations. All three testified that Lindsey suffered a hearing loss. Additionally, Lindsey testified that her hearing was muffled after the accident and that she suffered from tinnitus. Dr. Heidenreich testified that while it is not possible to test for tinnitus, both symptoms Lindsey complained of are consistent with air-bag explosions. Hence, examination of the entirety of the record in the light most favorable to plaintiff plainly reveals that Lindsey's complained of symptoms and conditions were observed and perceived by Keenan and Dr. Heidenreich's testing and that Christian also observed and perceived Lindsey's hearing loss in everyday situations. Consequently, plaintiff has demonstrated, in accordance with *McCormick*, that there is a physical basis for her complaints. See, *id*. at 198. [322 Mich App at 608-610.]

What is missing in the current case are the objective observations that buttress plaintiff's subjective complaints. At best, the objective evidence plaintiff submitted supports some tenderness remaining in his legs. But the objective evidence of impairment is lacking; even Dr. Hamati stated that plaintiff walks with a normal gait and his report lacks any significant observation of an impairment.

Turning to the second factor, it requires that any impairment be of an important body function. Plaintiff states in his brief, without substantiation, that he has serious limitations on his ability to ambulate. His brief even acknowledges that he "has had numerous subjective complaints that his ability to walk and move have been significantly impaired. Plaintiff has also stated he is at risk of falling, due to his legs giving out." Plaintiff claims to be at risk of falling, but does not cite any instances in which he had actually fallen due to his legs giving out. Moreover, this claim

is directly contradicted by Dr. Hamati's report (which, again, is submitted by plaintiff, not defendant). As previously noted, Dr. Hamati states that plaintiff has a normal gait, that he can walk without major problems, that the neurological exam on his extremities is within normal range, that there is no major instability in his knees, although there is a slight weakness in his quadriceps.

Plaintiff also points to his claims of impairment to his mental health, leading to anxiety, depression, and paranoia. This might arguably present a claim of an impairment of an important body function, but even if it does the objective evidence of it is completely lacking. Although plaintiff claims to be debilitated by the anxiety and fear of being involved in another accident, he presents no evidence from a mental health professional to corroborate this. In fact, it appears that plaintiff has declined to seek therapy to treat this condition.

In short, plaintiff points to no evidence of an actual impairment to an important body function.

The third prong requires the showing that the impairment affects the general ability to lead a normal life. In his brief, plaintiff cites a few areas where his life has been affected. First, that he was given a knee brace for his injured leg and knee immediately after the accident. While the dispensing of a knee brace is substantiated by the emergency room report, and plaintiff testified to it in his deposition, plaintiff does not indicate how long (if at all) he wore the brace or how significantly it affected his ability to walk or to engage in activities. Plaintiff also refers to a diminished ability to engage in landscaping, plowing, and irrigation due to the knee injuries. He did testify in his deposition that he was limited in these activities. This seems to be contradictory to the fact that one of his post-accident jobs was landscaping in which he stated that he engaged in "heavy lifting."[3] Finally, plaintiff refers to his struggles with driving due to the paranoia of being involved in another accident. Plaintiff did acknowledge in his deposition that he does own a motor vehicle and has a valid driver's license. And, in any event, as Dr. Hamati's report reflects, there are no physician-imposed restrictions on plaintiff's activities, other than perhaps the need to occasionally sit instead of standing.

Once again, the available evidence simply does not support plaintiff's claim.

For the above reasons, we conclude that plaintiff has not established a genuine issue of material fact regarding the no-fault serious impairment threshold and that the trial court did not err in granting summary disposition.

Affirmed. Defendant may tax costs.

/s/ Mark T. Boonstra
/s/ Kathleen A. Feeney
/s/ Adrienne N. Young

---

[3] Plaintiff developed an umbilical hernia and sought treatment for it in August 2020 when he worked doing landscaping.